UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | |
|---|---|
| **BRENTWOOD INVESTMENTS, LLC,**  )<br>)<br>**PLAINTIFF** )<br>)<br>v. )<br>)<br>**JAMES G. STANLEY, JR.,** )<br>)<br>**DEFENDANT** ) | **CIVIL NO. 2:14-CV-151-DBH** |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

On April 10, 2014, Brentwood Investments, LLC filed this lawsuit against James G. Stanley, Jr. seeking to recover principal, interest, late payment charges, costs of collection, and attorney fees in connection with a Note that Stanley signed on January 27, 2011. Previously I denied the parties' cross-motions for summary judgment. I conducted a bench trial on September 22, 2015, and heard closing arguments on October 8, 2015. The following are my findings of fact and conclusions of law.

**FINDINGS OF FACT**

1. In 1987, James G. Stanley, Jr. began working for Michael Liberty and various entities through which Liberty conducted business. Stanley became chief financial officer and chief executive officer for several of the corporate entities that Liberty owned and was also responsible for several Liberty partnerships. In 2009, Stanley hired Robert Johnson as chief financial officer for various Liberty companies.

2. Michael Liberty had no personal checking account. He used his various entities as well as his lawyers' client trust accounts[1] as his source of funds not just for business purposes, but for personal expenses, needs, and desires as well. Financial employees for Liberty entities were required to do whatever Michael Liberty told them to do.

3. Often there were insufficient funds at a particular entity to make payroll or pay withholding taxes, insurance, or rent.

4. From time to time, Stanley and/or his wife advanced money to the Liberty entities or used their personal credit cards to maintain services (for example, providing a personal American Express card to Liberty's law firm and accounting firm to ensure continuing services).

5. The advances were not always documented with a Note.

6. The total amount due to the Stanleys decreased when the entities were able to repay them—for example, when the entities received management fees or had a "liquidity event" such as a refinancing.

7. In 2011, Stanley needed assistance in extricating himself from a condominium development deal that had not panned out as he had hoped.

8. Liberty personally offered to advance Stanley $300,000, later reduced to $270,000, to assist Stanley in making his peace with a bank lender.

9. Stanley wanted the amount to be credited against amounts Stanley had previously advanced to the Liberty entities, but Liberty insisted that Stanley

---

[1] At trial, the witnesses sometimes referred to the lawyers' client trust accounts as IOLTA accounts. IOLTA is the acronym for "interest on lawyer trust accounts" and refers to a method by which legal services organizations in some states are funded.

2

sign a Note for this transaction, telling Stanley that Liberty in turn was borrowing the money and needed to demonstrate to his lender that there was security (in this case, an expected return to Stanley from an upcoming transaction involving Colorado real estate).

10.     Accordingly, on January 27, 2011, Stanley signed a Note for $270,000 to Brentwood Investments, LLC. By its terms, payment of the Note was due on February 28, 2011.

11.     At the time, Brentwood Investments, LLC was a Florida limited liability company with its principal office in Portland, Maine. See Joint Ex. 20. Later, it converted to a Delaware limited liability company. See Pl. Ex. 9. Liberty was and is Brentwood's sole member and owner. As an LLC, Brentwood has no shareholders. Stanley has never been employed by Brentwood and never advanced money to Brentwood.

12.     Liberty is one of Brentwood's two managers. The other is Brittany Abbass, who lives with Liberty. She performs the bookkeeping for Brentwood, but Liberty has the final say in how things are booked. Although Brentwood has a checking account, most of its business is transacted through Liberty's lawyers' client trust account.

13.     Brentwood is an investment company that Liberty uses to invest in other companies and to pay personal expenses. Liberty runs most of his personal expenses through Brentwood, including the purchase of the Florida house in which he and Abbass live, and purchases of cars for himself, his children, Abbass, and her brother. When Brentwood pays for Liberty's personal

3

expenses, it may treat the payment as a loan to Liberty or as a reduction of Liberty's equity in the company.

14. In exchange for the Brentwood Note, Stanley received a check for $270,000 from Liberty's lawyers' client trust account. Abbass, the Brentwood manager and bookkeeper, "booked [the lawyers' trust] account like a bank account" on the Brentwood books. Def. Ex 7. She told Stanley and Johnson that the loan to Stanley "is on the [B]rentwood books unless you want that under AHPC, let me know." Id. AHPC stands for American Housing Preservation Corporation—another Liberty entity involved in Federal Housing Administration projects, of which Liberty is the sole shareholder. According to Johnson (AHPC's CFO), Liberty also uses AHPC to pay for personal expenses, including property maintenance, travel, and child support payments. Abbass testified that the $270,000 came from one of the companies that Liberty owns, Mozido, and the lawyers' client trust account ledger seems to confirm that is what happened. Id.

15. Stanley has never paid principal or interest on the Brentwood Note.

16. During 2011, differences between Liberty and Stanley became irreconcilable, and they parted ways in late 2011/early 2012.

17. In March 2012, Stanley sued Liberty and some of the Liberty entities[2] in state court for retirement benefits that Stanley asserted Liberty had promised him; for defamation; for amounts that Stanley said he had advanced

---

[2] These are referred to as the "Liberty companies" and consist of Liberty Group, Inc. (LGI), Equity Builders, Inc. (EBI), Liberty Management, Inc. (LMI), American Housing Preservation Corporation (AHPC), and Mainland Development Company. Stipulated Facts ¶ 4. Brentwood is not one of the "Liberty companies" as so defined. AHPC, one of the companies that Abbass told Stanley and Johnson could be the payee of the Note, see Def. Ex. 7, is a "Liberty company." Stipulated Facts ¶ 24.

4

and not been repaid (these are described as Stanley's "employee account" or "due tos" and "due froms"); and for other related claims.

18. In August 2012, the parties to that lawsuit (which did not include Brentwood) agreed to arbitrate their dispute before Arbitrator David Plimpton.

19. In September 2012, Liberty and his various companies filed counterclaims against Stanley in the arbitration, arguing that there was a net debt owed by Stanley to the Liberty interests. Count VI of the counterclaims sought payment of the $270,000 Note to Brentwood that Stanley had signed. That was the first time that anyone had asked Stanley to pay the principal on the Note despite the fact that, by its terms, it was due on February 28, 2011.

20. In October 2012, Stanley's lawyers sought to strike the counterclaims regarding any entity that was not a party to the arbitration agreement, including Brentwood's claim on the Note. Joint Ex. 14.

21. By agreement of the parties, Liberty and the Liberty companies then waived their claim on the Brentwood Note, but they preserved it for anyone else to pursue in the future in a different forum. Joint Ex. 15. Count VI of the counterclaim was withdrawn.[3]

22. Despite ostensibly waiving any claim they might have on the Brentwood Note, Liberty and the Liberty companies used the $270,000 debt in their presentations to the arbitrator concerning calculations of the amounts they claimed were due to Liberty from Stanley. For example, a March 15, 2013, arbitration exhibit bearing the name of both Liberty's law firm and Liberty's

---

[3] Arbitrator Plimpton confirmed this withdrawal in his decision. Joint Ex. 19 at 4-5, 13.

accounting firm refers to "Cash advanced to Jim Stanley by Liberty in principal amount of $270,000, evidenced by promissory note payable, dated January 27, 2011." Def. Ex. 4. The calculations were later revised during the arbitration, but they still showed the $270,000. See Def. Ex. 5 at 499. Liberty testified about the Note at the arbitration hearing and claimed that the $270,000 was owed to him.[4] CFO Johnson testified at this bench trial that he believed that the money was actually owed to Liberty.[5]

23. During the arbitration, Stanley withdrew his claim that Liberty owed him money on his so-called employee account. But Liberty and the Liberty companies continued to press their counterclaim that Stanley owed them money for amounts that they said he had extracted from the companies, and they included the $270,000 Brentwood Note in their calculations. The arbitrator issued his award on July 21, 2013. He awarded Stanley substantial sums on his claim for retirement benefits against Liberty individually and Liberty Group, Inc.,[6] Joint Ex. 19 at 49, and against Liberty individually for defamation, id. at 51.[7] The arbitrator ruled against Liberty and his companies on all of their

---

[4] There is no transcript of the arbitration hearing, see Joint Ex. 19 at 28, but Stanley, who attended the arbitration hearing, testified in this bench trial that he heard Michael Liberty give this testimony at the arbitration hearing, Trial Tr. at 171, and no one challenged or contradicted this part of Stanley's testimony. Michael Liberty did not attend the bench trial despite Stanley's attempt to subpoena him, and Stanley asks me to draw a "missing witness" negative inference against Brentwood. I find it unnecessary to do so.

[5] Stanley also testified in this bench trial that he heard Johnson give similar testimony at the arbitration hearing. Trial Tr. at 171-72.

[6] "LGI [Liberty Group Inc.] was the literal and de facto parent of the other [corporate entities] and often guaranteed personal debt and obligations of [Michael] Liberty and [of] the other Liberty [corporate entities]." Stanley v. Liberty, 2015 ME 21, ¶ 4, 111 A.3d 663 (alteration in original) (quoting the arbitrator).

[7] He also awarded Stanley a declaratory judgment against AHPC concerning Stanley's rights if the Colorado properties were refinanced or sold. Joint Ex. 19 at 50-51.

6

counterclaims. Id. at 52. The arbitrator ruled that Liberty and the Liberty companies did not meet their burden to prove a net amount owing from Stanley to Liberty and the Liberty entities based upon the evidence that Liberty and his companies put forward—including exhibits that included the $270,000 on the Brentwood Note. Joint Ex. at 93-96.[8] Stanley moved to confirm the arbitration award in the Maine Superior Court (Cumberland County), and the matter was subsequently transferred to Maine's Business and Consumer Docket. The Business and Consumer Court and the Maine Law Court both affirmed the arbitrator's award. Stanley v. Liberty, 2015 ME 21, 111 A.3d 663; Stanley v. Liberty, BCD-CV-13-62 (Bus. & Consumer Ct. Mar. 20, 2014, *Horton, J.*).

24.   Stanley is still trying to enforce that judgment against Liberty and Liberty Group, Inc.

## CONCLUSIONS OF LAW

1.   Jurisdiction is based upon diversity of citizenship. 28 U.S.C. § 1332.

2.   The parties agree that Maine law applies.

3.   Brentwood is not a holder in due course because Brentwood is the original payee on the Note, and Stanley is the original obligor. According to the statutory comment to Maine's Uniform Commercial Code:

---

[8] Stipulated Facts ¶ 31:
> The Arbitrator stated, "Respondents did not meet their burden of proof to show by a preponderance of the evidence . . . that, when considering the acknowledged or proven advances made by Claimants [Stanleys] to Respondents [Liberty and Liberty companies] for loans and to cover Respondents' business expenses, Respondents were owed any net balance due . . . ."

> The payee of an instrument can be a holder in due course, but use of the holder-in-due-course doctrine by the payee of an instrument is not the normal situation.
>
> . . .
>
> In the typical case the holder in due course is not the payee of the instrument. Rather, the holder in due course is an immediate or remote transferee of the payee. *If Obligor . . . is the only obligor on the check or note, the holder-in-due-course doctrine is irrelevant in determining rights between Obligor and Obligee with respect to the instrument.*

11 M.R.S.A. § 3-1302 U.C.C. cmt. 4 (emphasis added). The comment goes on to explain that "in a small percentage of cases it is appropriate to allow the payee of an instrument to assert rights as a holder in due course." Id. These cases are those "in which conduct of some *third party* is the basis of the defense of the issuer of the instrument." Id. (emphasis added). That factor is not present here. The cases Brentwood cites from other circuits seem to involve situations where the presence of a third party complicated the right to payment, unlike here. In addition, the only Maine case squarely addressing this issue suggests that a party in the position of Brentwood cannot be a holder in due course. See Portland Morris Plan Bank v. Winckler, 127 Me. 306, 143 A. 173, 175 (1928) ("Nor was the plaintiff, as contended by it, a 'holder in due course.' While a payee may be a holder in due course, the plaintiff was an 'immediate party.'" (citations omitted)) (pre-U.C.C. decision under the Negotiable Instruments Law). In any event, Brentwood is the alter ego of Michael Liberty, as I conclude below, and thus was fully aware of any defenses that Stanley had to payment of the Note. That is yet another reason why Brentwood is not a holder in due course: "A holder in due course is a holder who takes an instrument in good faith, for value, and without notice of any claims or defenses." Maine Family Fed. Credit Union v. Sun Life Assurance Co., 1999 ME 43, ¶ 14, 727 A.2d 335 (citing 11 M.R.S.A.

8

§ 3-1302(1) (1995)). Therefore, Brentwood is subject to any defenses that Stanley has to payment of the Note. See 11 M.R.S.A. § 3-1305(1)(b), (2).

    4.    The arbitration decree, as affirmed by the Maine Business and Consumer Court and the Maine Law Court, resolved all "due tos" and "due froms" pertaining to Michael Liberty and James Stanley—including the Brentwood Note. Thus, the arbitration decree provides Stanley with a complete defense on the Note if Brentwood's claim is the same as Michael Liberty's claim.

    5.    According to the RESTATEMENT (SECOND) OF JUDGMENTS, in the case of a closely held corporation:

> The judgment in an action by or against the holder of ownership in the corporation is conclusive upon the corporation except when relitigation of the issue is justified in order to protect the interest of another owner or a creditor of the corporation.

RESTATEMENT (SECOND) OF JUDGMENTS § 59(3)(b) (AM. LAW. INST. 1982). Comment e to section 59 provides:

> For the purpose of affording opportunity for a day in court on issues contested in litigation . . . there is no good reason why a closely held corporation and its owners should be ordinarily regarded as legally distinct. On the contrary, it may be presumed that their interests coincide and that one opportunity to litigate issues that concern them in common should sufficiently protect both. . . . When the controlling owner is the party to the litigation, his opportunity and incentive to litigate issues commonly affecting him and the corporation [are] ordinarily sufficient to treat his participation as being on behalf of the corporation as well. In these circumstances, therefore, the rule of issue preclusion prima facie should apply.

The same principle applies to this limited liability company where Michael Liberty is the sole member and no evidence was presented of any need to protect the interest of Brentwood creditors.[9]

The Maine Law Court has endorsed and applied comment e to section 59. See Spickler v. Dube, 644 A.2d 465, 468 (Me. 1994).  In Spickler, the dispute was whether the parties or their privies were the same in both actions because in the first Spickler appeared in his personal capacity, and in the second he was pursuing the rights of a corporation.  The Law Court stated:

> Generally, a judgment in an action to which a shareholder is a party has no preclusive effects upon the corporation.  The identity of the parties, however, is not a matter of form, but of substance, based in part on an identification of the interests advanced in the first proceeding.
> When a corporation is closely held, the interests of the corporation, its management and shareholders generally fully coincide.  If the corporate form is ignored by the corporation's proprietors, the corporation may be treated as their alter ego. . . .
> *[I]f a corporation is closely held, then the judgment in the shareholder's action is conclusive on the corporation except when relitigation is necessary to protect the interest of another owner or a creditor of the corporation.*

Id. at 467-68 (emphasis added) (citations omitted).  That reasoning applies here to Michael Liberty and his limited liability company.

      6. If Brentwood had a different basis for demanding payment on the Note than Michael Liberty had, the reservation of rights in the stipulation filed with the arbitrator would allow Brentwood to proceed on its collection efforts in this case.

---

[9] The parties have not pointed to any discussion of LLCs in the Restatement or in the caselaw that would justify treating them differently from closely held corporations.

7. But Brentwood had and has no different basis for payment. Instead, Brentwood *was* Michael Liberty—or, to use the Spickler terminology, Brentwood was Michael Liberty's alter ego. Liberty personally agreed to advance the $270,000 to Stanley and, as was his custom, Liberty used one of his wholly owned entities to provide the funds and receive any corresponding obligation to repay. As Abbass's email demonstrates, it did not matter to Liberty whether the obligee was Brentwood or AHPC, one of the parties in the arbitration. The arbitrator's ruling that Michael Liberty failed to show a net amount due to him, on calculations that included the Brentwood Note, forecloses the Brentwood effort here. The arbitrator specifically considered the relationship between Liberty and the entities he controlled (including Brentwood, see Joint Ex. 19 at 61, even though it was not a party to the arbitration) and concluded that they satisfied the criteria for alter ego/corporate veil piercing. Id. at 60-61.[10] The Maine Law Court affirmed his ruling, stating:

> [T]he arbitrator made thorough findings of fact, identifying seven factors supporting a finding of abuse of the privilege of a separate corporate identity. The arbitrator then found that it would be unjust and inequitable to recognize the corporate form, given Liberty's position as an officer and, in effect, the alter ego of the corporations. . . .
> Although Liberty is correct in arguing that Maine law imposes "more stringent standards" for piercing the corporate veil in contractual disputes, an arbitrator may nonetheless pierce the corporate veil when the evidence supports a finding that the corporation is merely an alter ego of an individual and when necessary in the interests of justice.

---

[10] The arbitrator engaged in corporate veil piercing to support his conclusion that Michael Liberty individually, as well as LGI, should be liable to Stanley for promised retirement benefits. See Joint Ex. 19 at 61.

11

Stanley, 2015 ME 21, ¶¶ 28-29, 111 A.3d 663 (citations omitted).[11]

8. Since Liberty himself is foreclosed from recovering on the Note because he wrapped it back into the arbitration and lost, he cannot now recover it through Brentwood, a company that he owns solely and controls, and is his alter ego. The arbitrator did not reject this part of Liberty's employee account reconciliation claim against Stanley on the basis that it was a Brentwood claim rather than a Liberty claim, but because, after considering all the "due tos" and "due froms," Liberty could not show that Stanley owed him any money. Brentwood calls using this argument to defeat its claim as *reverse* veil-piercing and says that the Maine Law Court disfavors it, citing Sturtevant v. Town of Winthrop, 1999 ME 84, ¶ 21, 732 A.2d 264. In Sturtevant, however, the Law Court was referring to cases where a *shareholder* was seeking to ignore the corporate structure that he himself created. Id.[12] That is not the nature of Stanley's effort here. Stanley is not a Brentwood shareholder. (There are no shareholders as such and Michael Liberty is Brentwood's only member, Stipulated Facts ¶ 32.) Instead, Stanley—an outsider to Brentwood—is claiming that the Brentwood claim on the Note is in reality the Liberty individual claim and that he has a *defense* to that claim because Michael Liberty the individual

---

[11] If more is necessary on abuse of the privilege of a separate identity, it is present here in these seven factors that I find: common ownership; pervasive control; confused intermingling of business activity, assets, or management; nonobservance of corporate formalities; siphoning away of corporate assets by the dominant shareholders; nonfunctioning of officers and directors; and use of the corporation for transactions of the dominant shareholders. See Johnson v. Exclusive Props. Unlimited, 1998 ME 244, ¶ 7, 720 A.2d 568; see also Snell v. Bob Fisher Enterprises, Inc., 106 F. Supp. 2d 87, 90 (D. Me. 2000).

[12] See also Zimpritch, Maine Corporation Law and Practice § 2.6 at 48-49 (3d ed. 2015).

12

asserted and lost it in arbitration.[13] The parties have not cited any case or commentary where the reverse piercing doctrine has been discussed in that defense context. Because I conclude that Maine's alter ego and claim preclusion doctrines resolve the controversy here, I do not decide whether the Maine Law Court would accept or reject this form of outsider reverse piercing.[14]

9. I recognize that the Stanley motion to strike Counterclaim Count VI in the arbitration (where Brentwood initially sought to recover on the $270,000 Note) is puzzling. Stanley himself had treated the Note as an offset in constructing his employee account. In a September 30, 2011, email to Liberty, he stated, "I have taken that $270,000 into account. Gleichman mess [referring to the failed condominium project] was applied to my loans." Joint Ex. 10. In his lawyers' September 7, 2012, demand for arbitration, they too approached it the same way, referring to Stanley "taking a loan secured by that [expected

---

[13] Professor Crispi has divided the reverse corporate piercing doctrine into two distinct categories: insider reverse piercing and outsider reverse piercing. Gregory S. Crespi, The Reverse Pierce Doctrine: Applying Appropriate Standards, 16 J. CORP. L. 33, 37-38 (1990). Sturtevant is an example of the former, in which a shareholder seeks to ignore the corporate structure. Outsider reverse piercing encompasses situations "in which a person pressing an action against a corporate insider seeks to disregard the corporate entity to subject corporate assets to the claim or situations in which a person with a claim against a corporate insider seeks to assert that claim against the corporation." Crespi, supra at 55; see also Goya Foods, Inc. v. Unanue, 233 F.3d 38, 43 (1st Cir. 2000) (applying New York law). In the case of outsider reverse piercing, "[a] key factor . . . is the presence of corporate shareholders other than the insider against whom the outsider is asserting the primary claim. If other shareholders do exist, allowance of a reverse pierce would prejudice those shareholders by allowing the outsider to attach assets in which they have an interest." Crespi, supra at 65. There are no other shareholders here.

[14] Maine's standard for conventional corporate veil piercing was most recently articulated by the Law Court in Stanley v. Liberty:
> A party seeking to pierce the corporate veil to hold a corporate officer or director personally liable for the actions of a corporation must demonstrate that (1) the officer or director abused the privilege of a separate corporate identity; and (2) an unjust or inequitable result would occur if the court recognized the separate corporate existence.

2015 ME 21, ¶ 27, 111 A.3d 663. To the extent that veil-piercing principles apply, both criteria are satisfied here.

Colorado real estate] payment from an entity owned and controlled by Liberty [*i.e.*, Brentwood]." Joint Ex. 12 at 3. Because Stanley and Liberty had agreed on arbitrating their dispute, a global resolution should have been desirable to both parties, and Stanley's motion to strike created unnecessary complexity.

    10.    But despite Liberty's ostensible withdrawal of Brentwood's claim on the Note as a result of Stanley's motion to strike, Stanley then had to deal with the case as presented before the arbitrator. In the arbitration, Liberty proceeded to treat the Note as payable to him, even though earlier he purported to have waived such a claim. Stanley's lawyers noted in their Reply to Respondents' Post-Trial Brief that "Respondents even seek to recover the proceeds of a $270,000 loan to Jim from Brentwood, despite having withdrawn that very claim from their initial pleading on the basis that Brentwood is a non-party." Joint Ex. 18 at 12. I find nothing in the record to contradict that statement. Instead, the Stipulated Facts establish that "[i]n the arbitration, Mr. Stanley objected to the Arbitration Respondents' inclusion of the $270,000 in their accounting." ¶ 30. In Brentwood's opposition to Stanley's cross-motion for summary judgment, Brentwood tried to explain what Michael Liberty had done in the arbitration as follows:

> Notwithstanding the dismissal and preservation of Brentwood's claim under the Note, in their accounting in the arbitration, the Arbitration Respondents listed $270,000 as owed to them by Mr. Stanley. The Respondents took this action not to assert Brentwood's dismissed claim under the Note, but rather to protect themselves against any arguments Mr. Stanley might later make that, e.g., (1) a claim to the $270,000 could properly be asserted only by Mr. Liberty or other Arbitration Respondents, rather than separately by Brentwood under the Note, and (2) somehow the claim would have been waived under paragraph 3 of the Arbitration Agreement if not asserted.

14

Opp'n of Pl. to Def.'s Cross-Mot. for Summ. J. & Reply to Def.'s Opp'n to Pl.'s Mot. for Summ. J. at 4 (ECF No. 40).  And later:

> [W]hile the same $270,000 dollar amount was at issue in the arbitration, the Respondents were not asserting Brentwood's Note claim.  The context was such that a determination of whether the respondents were entitled to any money required an evaluation of *all of* the millions of dollars' worth of transactions over decades, and a resulting conclusion as to who owed what to whom—not just the simple question whether Mr. Stanley was liable on the Note.

Id. at 14.  I find it impossible to comprehend this rationale.  When the Brentwood Note claim was ostensibly withdrawn in the arbitration proceedings, it was with the stipulation that the claim was "*waived as to the Respondents, Liberty and the Liberty Companies (as defined in the Arbitration Agreement) to the extent any of Liberty or the Liberty Companies has a right to assert such claim[]*."  Joint Ex. 15 (emphasis added).  That waiver is flatly inconsistent with what Liberty and the Liberty Companies thereafter advanced in their arbitration claim.  Contrary to the waiver, Liberty *did* assert in the arbitration—both through documentary evidence and testimony—that the Brentwood Note was payable to him.[15]  According to the Law Court in Spickler:

---

[15] At closing argument, Brentwood argued that when Liberty and the Liberty companies tried to recover the $270,000 in the arbitration after waiving their claim, it was a "mistake."  Brentwood asserted that in preparing the arbitration exhibits that dealt with the "due tos" and "due froms," Johnson, CFO for many Liberty entities, mistakenly relied upon a spreadsheet, Plaintiff's Ex. 2, that Stanley had prepared before the arbitration.  Johnson did so testify about his characterization of the obligation in Defendant's Exhibit 5, which was the second financial exhibit that Liberty and the Liberty Companies presented to the arbitrator.  He did *not* so testify as to its characterization in Defendant's Exhibit 4, which was the first financial exhibit that Liberty and the Liberty Companies presented to the arbitrator.  On the contrary, Johnson testified that the $270,000 was included in Defendant's Exhibit 4 because he believed that Michael Liberty individually could collect on the Note.

Importantly, Defendant's Exhibit 4 is a document that bears the name of the Liberty accountants and, on every page of the Summary, the name of Michael Liberty's law firm, the same law firm that wrote the language in Joint Ex. 15 that any claim on the Note was "waived

> *Res judicata* prohibits relitigation of an entire cause of action between the same parties or their privies once a valid final judgment has been rendered in an earlier suit on the same cause of action. Accordingly, *res judicata* bars subsequent litigation if (1) the same parties or their privies are involved in both actions; (2) a valid final judgment was entered in the prior action; and (3) the matters present for decision now were, or might have been, litigated in the prior action.

644 A.2d at 467 (citations omitted) (internal quotation marks omitted).

11. I conclude that the arbitrator resolved the claim on the Note adversely to Michael Liberty, and that Michael Liberty cannot now avoid that outcome by having his controlled and solely-owned entity Brentwood, the LLC that handles his personal expenses, recover it as his proxy.

The Clerk shall enter judgment for the defendant.[16]

**SO ORDERED.**

**DATED THIS 20TH DAY OF OCTOBER, 2015**

/s/D. Brock Hornby
**D. BROCK HORNBY**
**UNITED STATES DISTRICT JUDGE**

---

as to the Respondents, Liberty and the Liberty Companies . . . ." Yet, what appears on page 2 of Defendant's Exhibit 4 is the following: "Cash Advanced to Jim Stanley by Liberty in principal amount of $270,000, evidenced by promissory note payable, dated January 27, 2011." Mistake or not, Liberty and the Liberty Companies continued to assert in the arbitration that the obligation on the Note was an amount that Michael Liberty and the Liberty Companies should recover, and they lost.

Brentwood also argued at closing that there was no "practical effect," "no impact" from the mistake. Under <u>Spickler</u>, that is not the standard for determining whether the affirmed arbitration decision has preclusive effect.

[16] I have not relied upon the exhibits that I admitted de bene over Brentwood's objection.

16